```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


UNITED STATES OF AMERICA      *  Case No. 1:17CR270-1
                              *
vs.                           *  Greensboro, North Carolina
                              *  August 2, 2018
BREXTON REDELL LLOYD,         *  2 p.m.
                              *
              Defendant.      *
*******************************
```

**TRANSCRIPT OF SENTENCING HEARING**
BEFORE THE HONORABLE CATHERINE C. EAGLES
UNITED STATES DISTRICT JUDGE

```
APPEARANCES:

For the Government:        JOANNA G. MCFADDEN, ESQUIRE
                           Office of the United States Attorney
                           101 S. Edgeworth Street, 4th Floor
                           Greensboro, North Carolina 27401


For the Defendant:         MIREILLE P. CLOUGH, ESQUIRE
                           Office of the Federal Public Defender
                           301 N. Elm Street, Suite 410
                           Greensboro, North Carolina 27410


Court Reporter:            Lori Russell, RMR, CRR
                           P.O. Box 20593
                           Winston-Salem, North Carolina 27120
```

Proceedings recorded by stenotype reporter.
Transcript produced by Computer-Aided Transcription.

1          **P R O C E E D I N G S**

2      (Defendant present.)

3          **MS. MCFADDEN:**  Good afternoon, Your Honor.

4          **THE COURT:**  Good afternoon.

5          **MS. MCFADDEN:**  If it please the Court, the only matter

6    on the calendar for this afternoon is United States versus

7    Brexton Redell Lloyd.  That's docket number 1:17CR270-1.

8    Mr. Lloyd is present.  He's represented by Ms. Clough.  The

9    matter is a continuation of the sentencing that commenced on

10   July 19th.

11         **THE COURT:**  And as I recall, there were no objections

12   to the guideline calculations, which -- Offense Level 14,

13   Criminal History Category I, 15 to 21 months, supervised

14   release 1 to 3 years, and a fine range 7,500 to 75,000 -- but

15   there were some disputes about the nature and extent of his

16   involvement more generally, I think, not about -- I mean, he's

17   admitted the two counts, but -- and as I recall, we were taking

18   evidence on that.  I had heard from the veterinarian from New

19   Mexico, whose name temporarily is escaping me, but I remember

20   all her testimony and my notes are in here as well.  Yeah.

21   So -- Dr. Robertson.  And I can't remember if the Government

22   had additional evidence they wanted to present.

23         **MS. MCFADDEN:**  We have no further evidence, Your

24   Honor.

25         **THE COURT:**  Okay.  And does the Defendant have

1  evidence on sentencing?

2          **MS. CLOUGH:**  No, Your Honor, we do not.

3          **THE COURT:**  All right.

4          **MS. CLOUGH:**  We did provide to the Court as a filing

5  additional documents that were supplemental to our position

6  paper that we filed.  We filed our position paper -- the date

7  escapes me.  But we did file some additional -- we filed our

8  position paper on July 11th.  That's Document 33.  And then

9  after that day, we filed additional support -- letters of

10 support from family members and friends.  I wanted to make sure

11 the Court had received them.

12         **THE COURT:**  Let me just be sure.  I'll take a look

13 here.

14         **MS. CLOUGH:**  I don't know what docket number it was.

15         **THE COURT:**  They were filed on the 18th it looks like.

16         **MS. CLOUGH:**  Yes, Your Honor.

17         **THE COURT:**  I think I do have those.  Let me open them

18 up to be sure.  There's a letter from Mr. Young, from

19 Mr. Wright, Ms. Gaalla.

20         **MS. CLOUGH:**  Yes.

21         **THE COURT:**  These are the letters you're talking

22 about?

23         **MS. CLOUGH:**  Yes, Your Honor.

24         **THE COURT:**  Yes.

25         **MS. CLOUGH:**  And then I think the day of sentencing,

 1    on the 19th, we submitted a letter from Roosevelt Dixon.

 2              **THE DEFENDANT:**  Gibson.

 3         **MS. CLOUGH:**  Gibson.

 4         **THE COURT:**  I recall you handing that up.  Let me just

 5    lay my hands on it.  Oh, that's right.  I remember it.  That

 6    was somebody who he had been in the military with, the

 7    Defendant.

 8         **MS. CLOUGH:**  Yes, an individual who is also related to

 9    Mr. Lloyd.  He himself had been in the military, but he is

10    Mr. Lloyd's uncle.

11         And then Mr. Young, who wrote a letter, was present in the

12    courtroom on the 19th, but he's not here because he had

13    traveled from Florida to support Mr. Lloyd.

14         **THE COURT:**  I'm sorry I had so much else going on that

15    day we couldn't finish.

16         All right.  Well, I will be glad to hear from you all on an

17    appropriate sentence.  I will take the guidelines into account

18    on an advisory basis.  The statutory maximum is 5 years and I

19    did -- my notes reflect -- and I think this is probably from

20    the written materials that were submitted -- that the Defendant

21    is asking for probation and the Government is asking for

22    something within the guidelines, in the middle of the range.

23    Those are my notes and -- but I will be glad to hear from you

24    in light of the evidence, the presentence report and such.

25         So, Ms. Clough, go ahead.

1    **MS. CLOUGH:**  Yes, Your Honor.  Thank you.

2        Your Honor, before we continue, I would like to introduce

3    the Court to Ms. Lamper.  She is Mr. Lloyd's girlfriend.  She

4    was interviewed for purposes of the presentence report and

5    provided some very nice words on his behalf.  Throughout she

6    has been consistently involved in the case and she has been his

7    number one supporter throughout this case.

8        Your Honor, it is very rare that I get to stand beside an

9    individual and really have so much to say on behalf of that

10   individual.  As the Court knows, routinely I stand before the

11   Court with individuals who have lengthy criminal histories, no

12   employment history, and sometimes I'm surprised how much I can

13   say in light of how little I have to work with.

14       Now, this is a case where I have so much to say about one

15   individual with respect to his history and characteristics that

16   I'm almost afraid that I might miss something and fail to

17   mention it to the Court, which is why we filed our position

18   paper; and certainly if I fail to mention anything that's in

19   the position paper, I'd certainly ask the Court to take all of

20   that into consideration.

21       You know, Mr. Lloyd is an individual who served our country

22   loyally for a very long time.  He then, after serving our

23   country loyally and being deployed, went on to serve our

24   government loyally for a very long time; and then after that,

25   as if it was not enough, he's gone on to provide loyal service

1  and support to family members and friends and most specifically

2  his mother, who the Court knows is very ill and with whom

3  Mr. Lloyd has provided constant and consistent support.  At one

4  point during his pretrial release, which he has completed

5  successfully, he was allowed to -- his conditions were allowed

6  to be changed to sort of allow him to continue with that

7  support of his mother.

8      So when the Court looks at this -- at the nature and

9  circumstances of the offense, the Court certainly has to weigh

10  all of these other 3553(a) factors.  Now, we have couched a lot

11  of our -- our requests in terms of departure, as well as

12  variances.  In the event that the Court would not consider a

13  lot of these matters as departures, we certainly think that

14  it's within the Court's jurisdiction or within the Court's

15  discretion to consider the matters as variances.

16      So I'll sort of walked through what we discussed in our

17  position paper.  I think one of the things that is really the

18  most disputed factor is certainly the nature and circumstances

19  of this offense and Mr. Lloyd's involvement in this offense.

20  Now, Mr. Lloyd pled guilty to the conspiracy of being involved

21  in animal fighting.  He pled guilty to possession of the two

22  dogs, for having them participate in animal fighting.

23      Now, in the spectrum of his involvement in that conspiracy

24  and the spectrum of his involvement in dogfighting, it is our

25  position that Mr. Lloyd was a breeder and, at best, someone who

1  was training these animals, perhaps for the purposes of

2  dogfighting, as he admitted and accepted responsibility to.

3      Even long before this matter was set for trial, Mr. Lloyd

4  had been debriefed by the Government, with the benefit of

5  Mr. Davis being present; and he was debriefed and interviewed

6  and gave a statement, which, incidentally, the Government did

7  not think was truthful at the time.  But then in preparation

8  for this sentencing, they did want to use whatever he had said

9  against him and presented that before the Court in a position

10 paper.

11      So, you know, Mr. Lloyd accepted responsibility for his

12 conduct in this involvement, and when the Court looks at the

13 presentence report and -- and, fortunately, the Court has

14 before it the transcript of the discussions between Mr. Lloyd

15 and Mr. Love and Mr. Gaines.  You know, this -- the number of

16 phone calls exchanged between these individuals that involved

17 Mr. Lloyd was one, maybe two at best -- at most.  Mr. Lloyd

18 exchanged some text messages with them, most of them involving

19 breeding a dog named Jeremiah.

20      There was some discussion in this phone call -- in the

21 transcript of the phone call about a fight and attending a

22 fight, but the Government can't show the Court any evidence of

23 Mr. Lloyd attending that fight.  And I'd submit to the Court

24 that if the Government could show that, they would present that

25 to the Court.  If the Government could show travel that

1  Mr. Lloyd was involved in in attending whatever fight they

2  thought was going on, they could have showed travel logs of it

3  or even tracked Mr. Lloyd's cell phone to prove that.

4      What the conversation and the transcript of the

5  conversation that I read said to me -- and, of course, the

6  Court can read it and have its own interpretation -- is that

7  during that conversation between Mr. Lloyd and Mr. Gaines and

8  Mr. Love, a lot of things that were discussed was rubbing

9  animals and whether Mr. Love or the other individual would

10 participate in a dogfight with another fourth individual who

11 they thought had been rubbing their dogs.

12     And Mr. Lloyd was telling them, "This is how you identify

13 rubbing.  This is how you can tell if someone has been rubbing

14 their dogs."

15     Even in one point during the transcript of that

16 conversation, there's a point where Mr. Love says -- mentions

17 Mr. Lloyd and says, "Oh, when he comes back, he's coming back

18 big," which to me means that Mr. Lloyd had not gone back to

19 dogfighting.

20     And I think the Government attached this as part of their

21 document.  I think it's Docket No. 34.  So I think it's page 13

22 of 41.  It's a conversation between Mr. Lloyd and Mr. Love.

23 Incidentally, MG is Mr. Gaines.  They're involved in this

24 conversation.

25     And JL at line 17 says, "Bro, I told you, he coming back

1  hard, man."

2      And I think that they're talking about the fact that

3  Mr. Lloyd at some point in his life had dogs that had

4  participated in dogfighting. Now, that -- that conduct

5  predates this conspiracy and predates this conversation by at

6  least 15 years. What they're referencing is that, yes,

7  Mr. Lloyd was giving it some consideration to coming back to

8  dogfighting, but it never actually came to fruition. What the

9  Court has before it is an individual who is breeding the

10 animals for that purpose, knew it was for that purpose, was

11 considering going back to fighting but did not ever actually

12 get there.

13     With respect to the training, there is an admission that he

14 had been involved in training two animals and that's what he

15 accepted responsibility for. I think it's Animals C-3 and C-8,

16 as referenced in the presentence report. The Animal F-1 was

17 entirely too old. If the Court read the Government's filing

18 from the agent, dogs are fought -- prime fighting age is

19 between 2 and 6. F-1 is approximately 10 years old as an

20 approximate age that the vets on the scene gave the dog.

21     Now, when you look at the dogs that Mr. Lloyd had at his

22 property, 13 dogs, 9 of them were puppies, none of them were

23 dogfighting age. The three that remained that he admitted

24 responsibility for were the two that he was -- mentioned in his

25 conversation that he was training, but really nothing ever

1    really came to fruition.  The Government cannot show that
2    Mr. Lloyd was ever at a dogfight during the period of the
3    conspiracy.

4        Now, they filed a sentencing transcript for this other
5    codefendant who received a significant period of time.  That
6    codefendant stands different from Mr. Lloyd because he had a
7    significant criminal history.  The dogs that were located in
8    his -- in his basement had a very different condition than the
9    dogs that were in Mr. Lloyd's property.  Those dogs actually
10   had been fighting and there's -- I believe at one point during
11   one of the transcripts of the sentencing hearing there had been
12   hundreds and hundreds of conversations between that defendant
13   and other individuals about dogfighting, setting money, and
14   actually engaging dogs in fighting.

15       That's not very consistent with Mr. Lloyd's involvement in
16   this offense.  Mr. Lloyd has one conversation, several text
17   messages, and all of them are within a very specific span and
18   period of time.

19       So when you look at the nature and circumstances, yes, what
20   happened to these animals that were fought is awful, but
21   Mr. Lloyd's involvement is not of an individual who was at a
22   dogfight, who took his dogs to a dogfight.  Instead, he's an
23   individual who participated in breeding, had done it for a long
24   time, as the Government can show, but there's really no
25   evidence of him being -- before the Court of him being involved

1  in any dogfighting directly.

2      Now, the Court did reference some conversation about "I've

3  got to be back because -- seven hours -- I don't want my

4  girlfriend to see it."  Sure, there was that mention and that

5  is in the transcript.  But, again, there's no evidence that

6  Mr. Lloyd actually picked up his dogs and went to that fight.

7      Now, even the Government's witness, the vet, said that the

8  scars were old.  You know, when I read the transcript of the

9  sentencing hearing that I received yesterday and was only able

10  to look at today, she talks about -- somewhere in

11  cross-examination, Your Honor, she said that they were at least

12  six weeks old, maybe even more than six weeks old -- maybe even

13  more than six weeks old.  So there's really no evidence on the

14  dogs from that vet's report of recent scars from recent

15  dogfighting.  There's no open wounds found on the animals.

16      You know, any -- any credibility the Court gives that vet,

17  an individual who examined -- didn't examine the dogs

18  physically but instead looked at photographs of the animals and

19  made determinations based on two-dimensional photographs of

20  what the animals' scarring -- or whatever the scar showed,

21  whatever credibility the Court gives that individual, she

22  herself said that they were likely much older than six weeks,

23  at least two weeks old.

24      The vets on the scene that -- the Court has their reports.

25  You know, they noted scarring consistent with dogfighting.

1　They didn't note quite as many scars as the individual who had

2　the photographic evidence, as opposed to the dogs present

3　before them, but, you know, their evaluation was that, yes,

4　there were scars consistent with dogfighting.  Again, not a

5　factor that we're disputing because those animals had that --

6　F-1 had a history of it.  Mr. Lloyd is known for caring for

7　animals as well.

8　　　　Now, I think there's also a cognitive dissonance or even a

9　cognitive sort of dialogue here about the fact that an

10　individual who breeds these animals can't also love these

11　animals and can't also have animals -- these animals as pets,

12　and I don't think that's an accurate -- accurate representation

13　for Mr. Lloyd.  Mr. Lloyd is an individual who at his home

14　presently has five dogs that he and his girlfriend care for and

15　love.  They are not pit bulls.  They've cared for those animals

16　very much, and those nine puppies that were on the property

17　they also cared for and loved for, and the other adult dogs

18　they cared for and loved for.

19　　　　**THE COURT:**  Well, they didn't -- I mean, maybe they

20　did, but when you read in paragraph 31 about how they were

21　found, it doesn't really sound like that.  They were wearing

22　thick collars, chained, out of reach of other dogs, chained to

23　trees, no water bowl -- the water was all frozen over.  I mean,

24　it doesn't really sound like they were being cared for very

25　well.

1    **MS. CLOUGH:**  Your Honor, you know, I think that the
2    Court can take judicial notice of the fact that it was March
3    and that water would freeze over depending on the temperatures
4    in March.

5       With respect to how the dogs are chained or positioned, for
6    a dog lover like myself who owns small pets and has pets in her
7    home, who practically has a pet eating at the table, that seems
8    like not the best conditions.  However, for someone who lives
9    in the country, who has country dogs -- if you were to talk to
10   individuals in Stokes County or Surry County, how they keep
11   their animals, they would tell the Court they chain them to a
12   tree.

13      So, you know, those dogs, when examined by those vets --
14   and those vet reports are present for the Court to consider --
15   those puppies didn't have any issues with weight, any issues --
16   any significant issues with scarring, any issues that those
17   vets noted that were remarkable for the Court to consider.

18      And so without any additional information -- you know, some
19   individuals wouldn't pen their dogs that way, but if you're out
20   in the country and have a large property, that is probably how
21   you would do it if you had several dogs.

22      Again, I don't want to get into a position where we're
23   disputing that Mr. Lloyd had these dogs, some of these dogs for
24   dogfighting; and I sort of don't want to skirt that line.
25   We've admitted to responsibility for that.  We admitted to

1   responsibility before the Government had to go to trial.  We

2   admitted to responsibility before this Court.  We've accepted

3   the facts in the presentence report and accepted all the

4   information in the presentence report.

5       We just ask the Court to consider that when you look at

6   those vet reports of the 13 dogs, the 9 puppies were doing

7   well.  They were all healthy.  They didn't have any issues that

8   those vets noted to be remarkable.  And even the older dogs

9   didn't have any remarkable issues.  Yes, they had scars from

10  dogfighting, but those scars weren't recent.

11      So when you even -- so once you get past the nature and

12  circumstances of the offense and Mr. Lloyd's role, you have an

13  individual who for 55 years has no criminal history, an

14  individual who served our nation, as noted in the presentence

15  report.  He graduated from high school in 1981, and after

16  graduating from high school went on to enlist in the U.S.

17  Marine Corps, received an honorable discharge in 1985, was

18  ranked highest as a sergeant.  He was a reservist from 1985 to

19  1991 and was called active to duty in 1990, went to Saudi

20  Arabia to assist in Desert Storm.  He was stationed at Cherry

21  Point, spent time in Japan, Cuba, and Puerto Rico; and his date

22  of separation was May 15th of 1991.  While he was there, he

23  received a Good Conduct Medal, Sea Service Deployment Ribbon,

24  National Defense Service Medal, and the Southwest Asia Service

25  Medal.  And this was all verified by the probation officer.

1    Then after that honorable discharge and that honorable
2  service and his duty to our country, he went on to serve the
3  government from 1991.  First he began as a correctional officer
4  at the Federal Correctional Institute in Louisiana, and then
5  moved to several other institutions:  Pennsylvania, Oklahoma.
6  He was a counselor there and ended up his career in New
7  Hampshire and then went on to work at the Texas Department of
8  Corrections.  All of this -- I mean, consistent employment
9  history all the way through.
10    And the Court has letters from individuals who served with
11  him and individuals who worked with him, so -- and I think that
12  it's important to look at that because that's Mr. Lloyd's
13  community.  The individuals he worked with, the individuals he
14  served with were also his community, but when the Court looks
15  at the type of sentence to give Mr. Lloyd and looks at his
16  criminal history, we also have to take into consideration his
17  smaller community -- and I'll get back to that point later --
18  mostly because when you consider the fact that Mr. Lloyd now
19  has three felonies on his criminal history -- he went from no
20  criminal history, but now he has three felonies on it -- the
21  people and individuals in that community that he is a part of,
22  those service officers, those people he served in active duty
23  with to those members of that community, having three felonies
24  on their record is a significant blemish.
25    So a lot of the time we think of -- in terms of punishment

1   in this court and most courts time; and, you know, I can't tell

2   the Court how many times I compare 20 years is less than 15, 10

3   is less than 5.  To those individuals with those criminal

4   histories who already have amassed several felonies, a felony

5   is not a blemish, but to Mr. Lloyd, having a felony -- three

6   felonies on his record is a significant blemish to him and the

7   community that he presents himself as an individual to.  And

8   that very same community, despite his involvement in this,

9   fortunately are still providing support for him.

10       Now, the other thing that we wanted to bring to the Court's

11  attention was Mr. Lloyd's diagnosis of posttraumatic stress

12  disorder.  Consistently after serving overseas Mr. Lloyd was

13  diagnosed with PTSD and the Court has his evaluation that is in

14  the presentence report.  This is something that has led

15  Mr. Lloyd to -- to take the following medication:  Doxepin,

16  bupropion, venlafaxine, prazosin, and hydroxyzine, all of them

17  significant medication that help him deal with the PTSD from

18  serving our country and working in the Bureau of Prisons

19  systems and the Department of Corrections systems.

20       We most recently -- he most recently was evaluated by

21  Dr. Tyler, whose information is in the presentence report as

22  well.  She again confirmed that he had PTSD, panic disorder,

23  acute distress disorder, dysthymic disorder, and major

24  depressive disorder.  And in there he admitted that he had bred

25  dogs since 1977, and he talked about what he considered himself

1  in relation to this conspiracy and in relation to his

2  involvement.

3      Now, Mr. Lloyd is a high school graduate, as I mentioned

4  before, no substance abuse issues, a loving family that he

5  cares for, a girlfriend that's present in the courtroom.  His

6  mother most recently has been diagnosed with cancer and we

7  provided the Court with that information.  That information was

8  also supported again by Mr. Davis in the motion to modify his

9  pretrial release.  Mr. Lloyd has been caring for his mother.

10 He is her only son.  There are no other family members

11 available to take on the role he has taken on.  He goes to all

12 of her dialysis appointments, all of her treatment

13 appointments, and all of -- any treatment that she has and --

14 that is mentioned in paragraph 58, Your Honor, the significant

15 relationship that's certainly pressing on Mr. Lloyd and a

16 consideration for him.

17     All that being said, Your Honor, we are asking the Court

18 respectfully for a sentence of probation.  Again, often in

19 these courtrooms we think that time -- and that's really the

20 ambit and the parameters we're working with.  But for

21 Mr. Lloyd, an individual with no criminal history, with an

22 unblemished employment history, with no substance abuse

23 problems, with a loving family, with family support, with a

24 significant mental health history, for him punishment in the

25 form of probation is significant.  It deters his comings and

1  goings.  But the Court has a very good indicator to determine

2  whether he would do well on probation.  He's been doing well on

3  pretrial supervision for a very long time and following those

4  conditions without any issue.  So we would ask the Court to

5  consider a probationary sentence.

6      If the Court is not considering a probationary sentence, I

7  would ask the Court to fashion a sentence that would -- if the

8  Court is considering some time, consider intermittent

9  punishment or even home detention or home incarceration.

10      At the end of the day, Your Honor, Mr. Lloyd is remorseful,

11  as he shared with the Government during his debriefing.  He is

12  taking responsibility for his actions, as he did before this

13  Court, before the Government went to trial; and he is asking

14  the Court to consider his service to this country, his service

15  to the Department of Corrections and the government, and his

16  medical history in fashioning a sentence.

17      If the Court is considering any time, we would respectfully

18  ask the Court to consider a medical evaluation, mental health

19  evaluation.  Mr. Lloyd has a high school diploma and some

20  additional education through the Marines.  Obviously, housing

21  here in North Carolina would be ideal.  And at the appropriate

22  time I would be making a motion to dismiss the remaining counts

23  of the charge pursuant to the plea agreement.

24      I'm available to the Court for any questions.

25          **THE COURT:**  If I could ask you -- I think I mentioned

1  this the other day, but I forgot to say it again today.  The

2  probation officer I think had suggested no -- no fine, but it

3  looked to me like maybe he could afford a fine.  He's got a

4  very expensive car.  He's paying what seems like a lot of rent

5  to his girlfriend.  He can certainly live less expensively.

6          **MS. CLOUGH:**  Yes, Your Honor.

7          **THE COURT:**  You know, I -- I know I excuse a fine

8  almost all the time because -- but I'm dealing with people then

9  who have nothing and aren't going to have anything.  He's got a

10 regular monthly retirement income and it seems like some

11 financial sacrifice might actually be appropriate in his case.

12         **MS. CLOUGH:**  If the Court -- I don't know if the Court

13 is considering the range in the guidelines, 7,500 to 75,000.

14         **THE COURT:**  I can't remember.  The guideline range

15 was --

16         **MS. CLOUGH:**  I think that is what is mentioned in the

17 presentence report.

18         **THE COURT:**  I don't know.  I hadn't settled on

19 anything.

20         **MS. CLOUGH:**  Yes.  Your Honor, I think that amount or

21 that range would be a hardship for Mr. Lloyd in light of his

22 obligations and his obligations to his mother.  We don't shy

23 away from a fine if the Court were to consider one.  He has

24 paid his special assessment and has paid the $300.  He paid

25 that when we were here for sentencing and I have a receipt if

1  the Court would like to see that.  But we did pay that on the

2  19th.  He -- if I may speak to him just a minute.

3          **THE COURT:**  Yes.

4          **MS. CLOUGH:**  Thank you.

5      (Discussion between Ms. Clough and the Defendant.)

6          **MS. CLOUGH:**  Your Honor, I did forget to mention --

7  and I do know that it's in the presentence report -- that he is

8  paying child support.  So -- two child supports.  So in

9  fashioning any fine, if the Court would consider that as well.

10     Mr. Lloyd tells me that he is available -- he had not

11 planned to allocute or to give a statement at the appropriate

12 time, but if the Court does have questions for him, he's

13 available.  I've explained to him that typically the

14 appropriate time is after the Government speaks.

15         **THE COURT:**  All right.

16         **MS. CLOUGH:**  Thank you.

17         **THE COURT:**  Thank you.

18     For the Government.

19         **MS. MCFADDEN:**  Thank you, Your Honor.

20     We forgot to mention this in our position paper, but

21 obviously, you know, we support the recommendation of

22 probation.

23     Before I sort of go through the 3553(a) factors though, I

24 wanted to clarify two things for the Court.  One is that the

25 presentence report refers to -- Ms. Clough referred to it as

1  well -- this debriefing.  We've not presented the Court with

2  any statement made in that debriefing in our position paper or

3  anything that I'm going to say today.  The statements that

4  we've made to the Court are relying on the discovery file, as

5  well as the uncontested facts in the PSR.

6           **THE COURT:**  As well as what?

7           **MS. MCFADDEN:**  Uncontested facts in the PSR.  I've not

8  sought to introduce anything Mr. Lloyd said to us at that time,

9  whether in his favor or against him.

10          The other thing I wanted to address was the frequency of

11  his communications with Mr. Love.  It's true that the PSR does

12  sort of highlight representative samples, but in terms of what

13  the file would reflect, there are call logs from T-Mobile

14  related to Mr. Love's cell phone number that show that they

15  spoke on the phone 119 times between November 1st, 2015, to

16  December 15th, 2015.  I know this information is in the PSR,

17  but I would proffer to the Court that's what the file reflects.

18          **MS. CLOUGH:**  I --

19          **THE COURT:**  Well, I'll hear from you.  I'll give you a

20  chance to speak after she speaks.

21          **MS. MCFADDEN:**  Likewise, the telephone records from

22  Verizon Wireless would show that there was continued

23  communication after the alleged or charged conspiracy up

24  through March 2017, which is the time of the search of

25  Mr. Lloyd's home.

1    In terms of the issues that have been raised both by the

2  presentence report, as well as the general 3553(a) factors, we

3  would just want to be heard briefly regarding the issues

4  regarding the -- first of all, the third point.  I think we've

5  made this point in our position paper.

6         **THE COURT:**  If you could just hold on just a second.

7  I'm sorry.  Let me -- I want to see if I have any questions for

8  you about what you just said.

9         (Pause in the proceedings.)

10         **THE COURT:**  Okay.  Go ahead.

11         **MS. MCFADDEN:**  The PSR identifies the issue related to

12  the third point.  Obviously, as the Court knows, this is a

13  motion that we make and we make it I would say, at least in my

14  cases, 90 percent of the time.  It's fairly often.  I

15  understand this is a rocket docket, and as such, often right on

16  to the eve of trial we can still make the motion.  But some

17  cases require greater trial preparation.  This plea came five

18  days before trial and working some sort of end-around for a

19  variance I think defeats the purpose of the guidelines

20  provision, so we don't think it's appropriate to account for

21  that for a variance.

22    With regard to any probationary condition related to the

23  possession of dogs, right now probation recommends that there

24  be no dogs unless the Court approves it.  We've just made the

25  request that we be allowed the opportunity to be heard on that

1  issue.  That's referenced in our position paper.  A lot of the

2  judgments in these cases in Alabama and Eastern District of

3  North Carolina say no dogs, period.  They don't even include

4  the opportunity for modifications.  So we think that's -- this

5  is sort of a commonsense request as it relates to should there

6  be a time we would visit that issue in the future that we would

7  be allowed to be heard on that issue.

8      With regard to the sentence under 3553(a), I think the PSR

9  paints a pretty complete picture both of the offense conduct,

10 as well as Mr. Lloyd's history and characteristics.  I think

11 it's significant that in light of all of those things,

12 including the fact that the lack of criminal history has been

13 accounted for in the guidelines range, that probation's

14 recommendation was within the guidelines.

15     We think that's appropriate, and it is largely based on the

16 nature and circumstances of the offense.  It's a serious crime.

17 The preponderance of the evidence here shows -- excuse me.  I

18 shouldn't have used that term.  The PSR, uncontested, shows a

19 decade's long involvement in this world dating back to the

20 1980s.  I think there's a misconception in animal fighting

21 cases that, you know, unless the offense conduct is, you know,

22 law enforcement bursting into a fight in progress and sort of

23 putting the cuffs on the defendant right there that somehow,

24 you know, participation in this world is less serious; and we

25 would disagree with that.

1    As the PSR notes in paragraph 16, the location and the

2  timing of these fights is often very secretive.  So these types

3  of cases, as they are brought in different districts all over

4  the country, don't really arise under those set of facts.  They

5  arise under, honestly, facts that are very similar to the ones

6  here, which include, you know, possession for the purpose of

7  training, breeding for the purpose of participation in an

8  animal fighting venture.

9    When here -- even if this wasn't a situation where, you

10  know, agents burst into some undisclosed location where a fight

11  was in progress, the uncontested facts here show a long

12  involvement in this world.  It includes breeding and training

13  and facilitating these fights.  Paragraphs 31 and 33 detail the

14  physical evidence found in Mr. Lloyd's home and that includes,

15  you know, the heavy collars and the spring pole.  That includes

16  the medical sort of supplies.  Paragraphs 34 through 36 detail

17  the digital evidence recovered, including the video of the

18  dogfight, the video of the dog in the slat mill.

19    And then there's also the telephone calls that the

20  transcripts are attached for and select highlights are included

21  in paragraph 24 of the PSR.  There's a discussion of, you know,

22  after the match of how long it will take to get home.

23        **THE COURT:**  I'm sorry.  Say again.

24        **MS. MCFADDEN:**  A discussion after the match of how

25  long it will take him to get home, not wanting his girlfriend

1  to see the dogs when they're brought back banged up.  There's a

2  text that's sent from Mr. Lloyd to Mr. Love in August 2015 that

3  appears to call out a weight.  That's paragraph 30.  And then

4  there's discussion of fights.  There's text messaging

5  discussing fights and breeding.  You know, then you have the

6  dogs kept in the manner they were kept at his home, which the

7  Court already addressed, and certainly the implements of the

8  dogfighting that were also recovered there.

9      The *Berry* opinion, which we cited to in our original

10 position paper, you know, it discusses why this is a serious

11 crime and it notes specifically that the lives of fighting dogs

12 are not to be envied and I think the evidence in this case

13 bears that out.  They were kept on heavy chains on chain spots.

14 They were kept in close proximity but not able to reach each

15 other, which, you know, we know can increase antagonism.  And I

16 don't know if that is a manner of keeping dogs commonly in

17 Stokes or Surry County or in the country, but regardless, it

18 doesn't mean that it's appropriate or that it's a life that a

19 dog is necessarily going to enjoy.

20     And when you look at the specific dogs, you know, C-8 had

21 severe dental problems that were in Dr. Robertson's report,

22 which was introduced into evidence in the last hearing, where

23 the pulp cavity was exposed.  F-1 had an infection of the feet.

24 Even the pictures themselves show bloody toes.  And they had

25 the frozen water and the greenish color, which Dr. Robertson

1    indicated, you know, meant it was more than a day old; that it
2    had probably been out there for a little bit.  Some of the dogs
3    bore scars of prior fights.  And then the presence of IVs, the
4    injectables, the Blood Stop Powder indicates sort of a crude
5    home medical care for these animals.  There was also evidence
6    of the dogs chained to heavy objects, being chained to
7    treadmills.  Again, that's in paragraphs 31, 36.
8        The various -- and it also, you know, sort of discusses the
9    societal harm to this crime.  Now, I understand this is not
10   necessarily your run-of-the-mill dogfighting crime, which
11   includes, you know, the presence of a firearm, the presence of
12   narcotics or even gambling specifically that's documented, but
13   by breeding these dogs to put them in this world -- in this
14   dogfighting world, you know, by training them, which, again, in
15   and of itself is a crime -- you don't have to fight them.  If
16   you're training them for fighting them, that's a violation of
17   the statute.  You know, facilitating these fights, it all
18   contributes to this subculture where these animals are
19   suffering and breeds, you know, sort of other types of
20   secondary crimes.  You know, the Sentencing Commission
21   recognized this harm fairly recently when they increased the
22   base offense level up to 16.
23       Now, with regards to the history and characteristics,
24   Ms. Clough has laid them out in detail in the position paper.
25   We don't take issue with them.  I think we just disagree on

1    whether or not those specific characteristics warrant some sort

2    of variance and, you know, we reject that they warrant a

3    probationary term.

4        Based on the length of involvement in this world, this

5    could potentially be a case for an upward variance.  We're not

6    seeking one and we're not even seeking the high end.  We're

7    seeking middle of the guideline range and it is specifically

8    because of, you know, many of these admirable characteristics

9    that are set forth in the position paper.  But, you know, the

10   guideline policy statements are clear about all of these

11   issues, about prior service, about family circumstances, which

12   is that they only warrant downward departures in particularly

13   unusual circumstances.

14       In our position paper, the second one we filed right before

15   sentencing, you know, there's a decent amount of case law that

16   discusses the family situation specifically, cites to 5H1.6,

17   how it's generally not a favored grounds for departure and, you

18   know, lists a lot of examples in these cases of situations that

19   are, you know, truly distressing; but again, you know, they're

20   not outside the wheelhouse of what normally occurs in these

21   types of situations; and Your Honor has been sentencing

22   defendants long enough to know that families suffer as a result

23   of choices their loved ones make.

24       With regard to the service, again, the guidelines

25   specifically note that lesser sentences based on prior service

1   are disfavored.  We didn't put this in our position paper, but

2   there are sort of a handful of cases that I came across -- I've

3   provided copies to Ms. Clough.  I can cite them for the Court

4   or provide copies, but they basically stand for this

5   proposition.

6       One is *United States versus Cox.*  That's 449 F.App'x 547,

7   Eighth Circuit.  The Court affirmed a within guideline sentence

8   for a former correctional officer who accepted a bribe.  He had

9   prior military service and it included a tour in Iraq where he

10  volunteered to work at an Iraqi children's burn site.

11      *United States versus Rita,* which is a Supreme Court case I

12  think we're all familiar with.  Again, you know, it was a

13  guideline sentence of 33 months for a defendant with a prior

14  work history in corrections and prior military service.  And

15  again, you know, the Courts affirmed the District Court's

16  decision to stay within the guidelines despite these particular

17  characteristics.

18      I know Your Honor asked at the last sentence that I

19  specifically address the former occupation as a correctional

20  officer and, you know, the sad truth is that former

21  correctional officers get sentenced to federal time quite

22  often.  Typically it's under the guise of public corruption

23  cases.  It comes about in false statement cases.  It comes

24  about in bribe cases.  Sometimes it involves drugs or violence.

25  But, you know, we don't live in a world where having had that

1  prior job alone exempts you from exposure to custodial terms.
2  In just a sort of quick search I did on the Internet, just in
3  2018 there's a host of different defendants that were sentenced
4  to federal time who had that in their past.
5          **THE COURT:**  Of course, it's one thing, just thinking
6  about it, if somebody is charged with some sort of public
7  corruption or taking bribes in connection with their work,
8  that --
9          **MS. MCFADDEN:**  No, that's absolutely true, Your Honor.
10         **THE COURT:**  -- that's different from what we have
11  here.  I'm not saying, you know, it's -- I would say it's
12  probably worse, but it also kind of -- I guess my concern here
13  was, you know, there is some safety issue and he hasn't used
14  his job --
15         **MS. MCFADDEN:**  As a means of facilitating.
16         **THE COURT:**  Yes.
17         **MS. MCFADDEN:**  I understand Your Honor's point.  To
18  that end, you know, there's sort of two cases again I would
19  cite to you and I can hand these up to the Court.  I've given
20  copies to Ms. Clough.
21     In *United States versus Zuni* -- that's 506 F.Supp.2d 663 --
22  you know, again there was a rejection -- request for a variance
23  based on prior service in law enforcement despite noting that
24  the status may make the imprisonment more difficult for the
25  defendant than that of other prisoners.

1    And in *United States versus Styles,* 587 F.App'x 26.  That's

2  the Third Circuit from 2014.  Again, the Third Circuit affirmed

3  the District Court's decision not to assign any extra weight to

4  that prior employment despite the potential harm.

5    Again, I think the thinking in these cases and again --

6  generally speaking, is that, you know, we have to trust that

7  these facilities are going to account for the safety of these

8  prisoners.  Otherwise, there's no sort of available sanction.

9  But I do appreciate the distinction the Court made between

10 using the role to facility the offense versus what we have

11 here, which seems to be conduct separate and apart from the

12 access that that would provide.

13    All this is to say that while these certainly are part of

14 who Mr. Lloyd is and are certainly worthy of consideration by

15 the Court, the policy statements, you know, specifically speak

16 to this.  They say that it really has to be special, has to be

17 unusual, has to be sort of out of the wheelhouse of what the

18 courts typically see; and, you know, based on the case law, I

19 just don't think that that situation is one that we find

20 ourselves in.  I think that it's notable again that probation,

21 you know, who prepared this report, is aware of all of these

22 facts as well, did not make, you know, a recommendation based

23 on that.  The recommendation was for middle of the guidelines.

24    You know, finally, in terms of the remaining 3553(a)

25 factors, I think a guideline sentence is necessary to reflect

```
1   the seriousness of this offense, to provide just punishment;
2   and I think deterrence is important in these crimes as well.  I
3   will note that the judge in the New Jersey case with
4   Mr. Gaines -- again, not a similarly-situated defendant to
5   Mr. Lloyd in the sense that he had a lengthy criminal history
6   that proceeded him, but the fact remains, and as the judge
7   noted, "General deterrence requires a substantial sentence for
8   this conduct.  The treatment of innocent animals in this
9   fashion is illegal, barbaric, and a violation of societal
10  norms."  (Unintelligible.)
11          THE COURT:  You need to slow down.
12          MS. MCFADDEN:  I'll read it again.  "General
13  deterrence requires a substantial sentence for this conduct.
14  The treatment of innocent animals in this fashion is illegal,
15  barbaric, and a violation of societal norms.  The sanction of a
16  substantial jail sentence is an effective way to communicate
17  the message."
18      And I think that a custodial sentence here is sufficient,
19  but not greater than necessary, to meet all the factors set
20  forth in 3553(a).
21          THE COURT:  All right.  Did you want to show
22  Ms. Clough discovery materials about those phone calls during
23  the relevant time or did you just bring your notes?
24          MS. MCFADDEN:  I just brought my notes.  They've been
25  produced.
```

1    **THE COURT:**  Okay.  Do you want to respond to that

2  part?

3    **MS. CLOUGH:**  I'm sorry, Your Honor.

4    **THE COURT:**  You've indicated you wanted to say

5  something about the phone calls.

6    **MS. CLOUGH:**  I did.  I'm not sure we know what the

7  nature of the extent of the text messages were.  I mean, I have

8  seen it -- I've seen it in the discovery at some point, but I

9  think the text messages that were highlighted were the ones

10  that were part of this activity and --

11    **THE COURT:**  Yeah, I think all she said was that there

12  were -- I've forgotten now what she said -- I think a hundred

13  phone calls or contacts.

14    **MS. CLOUGH:**  Right.

15    **THE COURT:**  So I don't think that there was any

16  reference to the substance.

17    **MS. CLOUGH:**  Right.  And I did want to address only

18  one thing with respect to her, if the Court allows for it.  I

19  know the Court doesn't usually allow for rebuttal, so to speak.

20    But in dealing with Mr. Gaines case, the Government filed

21  the transcript for the second part of the sentencing hearing

22  and available was also the first part of the sentencing

23  hearing.  The prosecutor in that case mentioned that there was

24  a ballpark of 130 hours' worth of just dogfighting-related

25  conversations in that particular case.  So that, to me, sets

 1 | Mr. Gaines significantly apart from Mr. Lloyd.

 2 |    **THE COURT:** All right. And according to the

 3 | presence report, which is not that old, sentencing for

 4 | Mr. Love and Mr. Arellano was still pending. And that's still

 5 | the case?

 6 |    **MS. MCFADDEN:** That is correct, Your Honor.

 7 |    **THE COURT:** Okay.

 8 |    **MS. CLOUGH:** We would ask -- I know I didn't mention

 9 | this earlier. If I did, it's in our position paper. But we

10 | are standing by our request for Mr. Lloyd to still be able to

11 | have the dogs he has on the property now.

12 |    **THE COURT:** Well, that -- yeah, I did want to ask

13 | about that because I did understand -- let's see. So the

14 | probation officer I think has suggested no dogs. Let me just

15 | get to that part. That the Defendant should not own, buy,

16 | sell, possess or care for any dog unless approved by the Court.

17 |   So are you asking me to strike that condition or -- I mean

18 | to not adopt that condition or are you asking me to approve

19 | some limited pet ownership?

20 |    **MS. CLOUGH:** Approve some limited pet ownership, but

21 | let me make sure with my client.

22 |   (Discussion between Ms. Clough and the Defendant.)

23 |    **MS. CLOUGH:** Your Honor, I think it would be some

24 | approved pet ownership. Specifically, we have no issue with

25 | the Court saying no nonfighting -- typical fighting dogs

1   present at his property, but they do have other dogs that are

2   on the property.  And as Dr. Tyler mentioned in her report in

3   the presentence report, they do provide significant mental

4   health treatment to Mr. Lloyd, and Ms. Lamper certainly would

5   like to have them there as well, not that she's part of the

6   proceeding.  But we ask the Court to consider it.  They've been

7   at the property all throughout pretrial supervision and it's

8   not been noted that there's been any issues with those dogs.

9       So we would ask the Court to allow them to keep those and

10  ask the Court to allow them to have nonfighting-type dogs.  I

11  understand the Government simply wants notice of any dogs that

12  come on the premises, if I understood correctly.  I don't think

13  that that would be difficult to provide.

14          THE COURT:  Well, I think they wanted to be heard

15  before dogs were allowed --

16          MS. MCFADDEN:  That's correct, Your Honor.

17          THE COURT:  -- on the premises.  So -- well, let me

18  hear from the Government.  I mean, the Defendant is asking to

19  be able to keep some small number of nonfighting dogs now.

20          MS. MCFADDEN:  Your Honor, I think our concern to that

21  is two-fold, which is, one -- and this is why I think it would

22  be appropriate to have no dogs in place and then revisit the

23  issue before the Court before any modifications -- that I think

24  it might be a pretty subjective idea as to what constitutes a

25  fighting versus a nonfighting dog.  I think we could probably

1  all agree that pit bull-type dogs are fighting dogs, but there

2  are certainly other types of breeds of large dogs that may or

3  may not be considered that depending on how they were bred and

4  how they were trained.

5      And I understand the statements of Dr. Tyler related to the

6  mental health issues, but what I don't know is if -- if the

7  same doctor understood sort of Mr. Lloyd's history with dogs

8  and his treatment of certain types of dogs, at least the ones

9  that were being trained to fight and the ones that were fought.

10     The "no dogs" provision is fairly standard in these cases

11  and even the allowance for modification by the Court here I

12  think here is a bit of an outlier.  So based on that, that

13  would be the basis of our request.

14          **THE COURT:**  All right.  Thank you.

15          **MS. CLOUGH:**  Your Honor, my only -- one of the issues

16  I have with that is that when Mr. Davis was negotiating a plea

17  agreement with the Government, one of the things that was a

18  provision of the plea agreement was that no dogs be allowed in

19  the property.  That provision was removed.  That's one of the

20  things that really was a sticking point during the plea

21  agreement process between the Government, Mr. Davis, who

22  represented Mr. Lloyd at the time, and Mr. Lloyd.

23          **THE COURT:**  But the plea agreement does not say he can

24  possess dogs, right?

25          **MS. CLOUGH:**  Correct.  I agree with that.  As far as

1  typical dogs for fighting, pit bulls are the typical dogs for
2  fighting.  Their own expert -- well, the agent who wrote -- who
3  is attached in the documents said that those were the most
4  typical dogs for fighting.
5      And certainly Dr. Tyler mentions that she's aware in
6  paragraph -- in paragraph 66 that she was aware of the
7  circumstances surrounding Mr. Lloyd's involvement with dogs.
8  There's nothing to suggest that he would have not made her
9  aware of that and certainly -- I believe the evaluation was
10 made during the process that he had -- after the dogs had been
11 removed.
12     I'm available for the Court if the Court has any questions.
13     Certainly there are times when the courts have varied up
14 and there are times when the courts have varied down, but
15 according to the ASPCA, a typical offender in this type of case
16 is someone who attends animal fights occasionally and has one
17 or two dogs or a few roosters who are used for fighting a few
18 times a year.  That is the typical offender.  That is cited in
19 slip opinions that the Government exchanged -- provided to me
20 in exchange with the probation officer during the presentence
21 preparation.  I don't think that that -- Mr. Lloyd qualifies as
22 that typical offender.  There's no proof he attended any
23 dogfights and there's no proof that his dogs were specifically
24 involved in any dogfighting.
25         **THE COURT:**  Okay.  I think you're starting to repeat

1  yourself.

2        **MS. CLOUGH:**  Yes, Your Honor.  I understand.

3        **THE COURT:**  Okay.  Mr. Lloyd, if you would stand.

4      If there's anything that you want to say to me before I

5  make a decision in your case, I'm glad to hear from you.  You

6  do not have to speak.  I won't hold it against you if there's

7  nothing you want to add, but if there is anything you want to

8  tell me, please go ahead.

9        **THE DEFENDANT:**  Can you hear me?

10        **THE COURT:**  I don't know.  Just start talking and I'll

11  let you know if I can't.

12        **THE DEFENDANT:**  Ma'am, I wasn't going to say anything

13  because I didn't want to take up any more of the Court's time.

14  I love my dogs, and when they took my dogs originally, I stayed

15  in bed for two days with depression.

16        **THE COURT:**  I'm sorry.  Say again.

17        **THE DEFENDANT:**  I stayed in the bed for two days with

18  depression because my dogs were gone and I thought I could get

19  them back.  Eventually I realized I wasn't and it hurts because

20  I love them.  They were the reason I got up every day.  The

21  dogs we have in the house, they keep me going.  They do.  I

22  need them.  I really do.  If not, I probably wouldn't be here.

23      Thank you.

24        **THE COURT:**  All right.  You can be seated.

25      (Pause in the proceedings.)

1      **THE COURT:**  Okay.  Stand up.

2      So I've considered the matter in light of the evidence and

3  arguments of counsel and Mr. Lloyd's statements.  I conclude

4  that the guidelines take into account much that is important in

5  sentencing in this case and give -- give the seriousness of the

6  offense and the criminal record -- well, at least give the

7  seriousness of the offense appropriate weight.

8      I am not going to take into account the -- or give a

9  variance based on his acceptance of responsibility several days

10 before trial and not give him the third point because I think

11 the Government is correct.  You don't get that through the back

12 door when you can't get it through the front door, and waiting

13 that close to trial to -- to take responsibility, the two-point

14 adjustment is sufficient and appropriate.

15     I'm also going to give only limited consideration to his

16 family situation.  It's certainly not sufficient for a

17 departure in terms of his mother's situation, and I regret to

18 say that many people who stand in front of me have difficult

19 family situations and family members who have health needs.

20 I'm going to take it into account, but I do not think it is

21 sufficient to justify a departure.

22     Indeed, I really didn't think any of the arguments for a

23 departure were sufficient.  That said, when I look at

24 everything taken as a whole, I think that a small variance down

25 may be appropriate.  This certainly is a very serious offense.

1   I do not think probation is appropriate.  It's a violent world

2   that dogfighting takes place in.  It's a very -- you know, it

3   harms these animals, as is obvious just from looking at the

4   pictures of the animals that Mr. Lloyd possessed and then, you

5   know, from the more general evidence that the Government

6   presented in their exhibits.

7       It is -- should be treated seriously and an active sentence

8   is appropriate to reflect the seriousness of the offense, as

9   well as to provide some deterrence both generally and

10  specifically here since there is pretty good indication that

11  Mr. Lloyd has been involved in this, at least on the breeding

12  end, for quite a while.  So some -- and some significant need

13  for just punishment.  So I do not think that a probationary

14  sentence is appropriate.

15      That said, his military service, his long employment record

16  and history, and his age, and the lack of a criminal history up

17  until these events at issue here, when I look at those all

18  together, it seems to me that coming off the guideline range a

19  bit is appropriate.  I might not do it for any one of those

20  things.  Having no criminal record when you're 21 is not the

21  same thing as having no criminal record when you're 58 or

22  something like that.

23          **THE DEFENDANT:**  It's close.

24          **THE COURT:**  Around in there.  Up in your 50s in any

25  event.  And having a stable employment history when you're 26

1    is not the same thing as having had a stable employment history

2    for decades and the military service as well.  So when I look

3    at all of those things together and when I take into account

4    his role in the offense, I think that a small variance is

5    appropriate.

6        I don't want to downplay his role because you can't have

7    dogfighting if somebody is not breeding the dogs, and he had

8    nine of those puppies there, and nobody has nine pit bull

9    puppies and a bunch of -- and a couple of fighting dogs, you

10   know, without something being -- going on with those puppies or

11   at least planned for down the road with those puppies.  So, you

12   know, this is -- the breeding role is necessary in this -- in

13   this culture and in these offenses for these offenses to really

14   take place.

15       On the other hand, it's not clear that he was directly

16   involved to a large extent with the fights themselves.  He may

17   have had some involvement with fights over the years, but that

18   doesn't seem to have been the focus.  I think it's appropriate

19   to take that into account.  But certainly there was evidence

20   from the videos and pictures that he had that he was definitely

21   doing some training over the years, definitely doing some

22   breeding.  That's a seriousness offense and it seems to me that

23   an active sentence is appropriate.

24       So I think I addressed all of the Defendant's arguments for

25   probation.  If there -- if I failed to consider something, I

1  hope you would remind me.  I believe I -- I believe I have -- I

2  mean, I read your brief.  I believe I've considered everything

3  that you argued.  I hope I have addressed your most substantial

4  arguments --

5          **MS. CLOUGH:**  I believe you did, Your Honor.

6          **THE COURT:**  -- for probation.  But having considered

7  all those arguments, an active sentence seems appropriate.

8          **MS. CLOUGH:**  Your Honor, I'm sure you considered this,

9  but I just want to make sure the Court mentions it for purposes

10  of the record, his mental health history and the posttraumatic

11  stress disorder.

12          **THE COURT:**  Thank you.

13      Yes, I did take that into account and as -- unfortunately,

14  I'm sure way over half of the people I see normally have a

15  diagnosis of some sort, so I don't think that takes it out of

16  the wheelhouse.  It is something to consider, though I may take

17  that into account more in other ways than determining the

18  length of the sentence.

19      So the Court is going to sentence the Defendant to a year

20  and a day in the custody of the Bureau of Prisons on each count

21  to run concurrently.  Let me just be sure I got that right.

22  Yes, a year and a day on each count to run concurrently.

23      Special assessment of a hundred dollars on each count.

24      No restitution.

25      I am going to impose a fine of $7,500.  It seems to me --

1    he may not have liquid assets, but he can afford to pay over
2    the course of his supervised release a fine and that can be a
3    monthly reminder.  I also think a fine is appropriate since I
4    have given him a bit of a variance here and, you know, I do
5    want to emphasize the seriousness of the offense and a fine is
6    one way to do that and it appears to me he can pay a small
7    fine.

8        I will recommend mental health treatment and -- while he's
9    in custody and that he be housed as close as possible to his
10   family in North Carolina.

11       After the active sentence, a term of supervised release is
12   appropriate.  I think three years is -- is a good term.  With
13   somebody with no record and his employment history, I might be
14   tempted to do a shorter term, but he has been involved in this
15   dogfighting world culture for quite a while.  So I think that
16   three years is an appropriate supervision period.

17       I will waive the interest on the fine.  I forgot to say
18   that.

19       I'll impose the standard conditions of supervised release
20   and the mandatory conditions.  In addition, I will adopt the
21   conditions recommended by the probation officer set forth in
22   the presentence report.  I will adopt the first ones in full:
23   No borrowing money without approval.  One has to assume there
24   was some moneymaking involved in breeding these dogs and we
25   need to be sure he's making a living only through lawful means.

1   The same as to providing financial information upon request.

2   Warrantless searches to be sure that he does not have any items

3   to use in dogfighting or otherwise participate in the

4   dogfighting operations in any way and he'll need to continue to

5   support his dependents.

6       In terms of his possession of the dogs while he is on

7   supervised release, I am going to require that he not own, buy,

8   sell, possess or care for any dog unless approved by the Court;

9   and that he may seek such permission after six months on

10  supervised release and the Government shall be given notice of

11  any such request.

12      I can say just -- you know, I will listen to whatever

13  request is made, but it would probably not be productive to ask

14  to have more than one small house dog under the circumstances

15  and I -- I'm not even really sure about that one, but I'm

16  willing to at least think about it after he's done his active

17  time and been on supervised release for a while because of the

18  psychologist's evidence.  We can evaluate that down the road.

19      But I -- I just feel it fair to the Defendant to say if he

20  comes in here and wants to have five dogs and they're of any

21  size, I doubt very seriously that's going to get approved.  I

22  say that just in fairness to him.  I will listen.  I appreciate

23  he may have a need for a companion pet and -- for his mental

24  health, and I will be willing to listen to that request after

25  he's been on supervised release for six months.

1    What have I forgotten besides his appeal rights?

2        **PROBATION OFFICER:**  Your Honor, would you address the

3  monthly installments related to the fine?

4        **THE COURT:**  Thank you.

5    If he does not get the fine paid off while he is in

6  custody, then he can -- will need to pay it as a condition of

7  supervised release; and given that he has a stable monthly

8  income, I will say he needs to start paying within 30 days.

9  There's really not much reason to wait longer than that under

10 his circumstances.  It looked to me he ought to be able to pay

11 $200 a month and that should get him pretty close to the fine

12 amount.

13       **MS. CLOUGH:**  Your Honor, could you possibly start at a

14 lower amount, more in the vicinity of $75?  I mean, at the

15 point he gets out of prison, he'll be three times a felon.

16       **THE COURT:**  Well, he's retired.  He's got a retirement

17 income.  He wasn't working at the time of these offenses, so

18 it's not like he needs to get a -- if he wants to get a job,

19 that would be great, but it looks to me like he's got

20 retirement income and he can live less expensively than he has

21 been living.  A couple hundred dollars a month, he ought to be

22 able to handle that.

23       **MS. CLOUGH:**  I respectfully understand that, Your

24 Honor, but they own five dogs now that will have to be placed

25 with his girlfriend; and so that means separate income,

1  separate households for them, so separate payments every month

2  for rent.  So that increases -- changes his living expenses.

3          **THE COURT:**  Well, that's -- if his girlfriend would

4  rather live with the dogs than him, that's up to her.  I mean,

5  I don't control that.  You can give dogs away.  You can --

6  there's lots of things to do about dogs.  You know, I'm -- I'm

7  not -- it looks to me like he ought to be able to live on his

8  retirement income and still pay a couple hundred dollars

9  towards a fine.

10     So -- all right.  Have I -- he does have -- there's an

11  appeal waiver, if I recall correctly.  Is that right?

12          **MS. CLOUGH:**  That is my understanding, Your Honor.

13  I'll have to double-check that.

14     I did want to ask the Court to respectfully recommend in

15  the very least a medical facility for him.  There are some

16  issues listed in paragraph 63 dealing with significant

17  arthritis, knee pain, and swelling in his legs.  I think that

18  information was verified by Veteran Affairs.  He is on

19  significant medication for that and the posttraumatic stress

20  disorder, so if the Court would consider that.

21     Also, we would respectfully ask the Court to allow him to

22  voluntary surrender and set a date for that surrender.  He has

23  been complying with pretrial supervision and been doing well

24  during that pretrial supervision period.

25          **THE COURT:**  Okay.  I'm not sure those health

1  conditions -- they'll give him a medical screening when he

2  reports and that seems to me to be sufficient, so I'm not going

3  to recommend a medical unit.  His health conditions don't seem

4  to the degree of getting me involved in that.  The Bureau of

5  Prisons will take care of that.

6      Does the Government have any objection to allowing him to

7  self-report?  I ordinarily probably would.

8          **MS. MCFADDEN:**  Yeah, Your Honor.  May we approach?

9          **THE COURT:**  Okay.

10     (The following bench conference was recorded.)

11         **MS. MCFADDEN:**  I understand that he's been complying

12 with the terms of his release.  My only concern is that in

13 paragraph 65 and 60 -- no, 65, I guess, details some of his --

14         **THE COURT:**  Speak a little louder.

15         **MS. MCFADDEN:**  Paragraph 65 details some of his issues

16 with him losing control and rage, and I understand that it's

17 different to be on pretrial release when you don't know what

18 the outcome is going to be versus when you do have a custodial

19 sentence and the situation with the dogs.  So I just wanted to

20 bring that to the Court's attention.  Obviously, it's in the

21 Court's discretion.

22         **THE COURT:**  Okay.

23         **MS. CLOUGH:**  I obviously think that's maligning his

24 character.  There's no indication that he would go into some

25 rage over -- on these dogs.  I apologize.  So --

1          **THE COURT:**  Well, it was the road rage event that I
2  think she was talking about.
3          **MS. CLOUGH:**  Yeah, completely distinct from the
4  animals.
5          **THE COURT:**  Okay.  Thank you.
6      (Conclusion of the bench conference.)
7          **THE COURT:**  I don't remember the terms of his pretrial
8  release.  If somebody can remind me of what has been --
9          **MS. CLOUGH:**  I think -- I don't know them
10  specifically, Your Honor.
11          **THE COURT:**  Let me find that out.
12          **MS. CLOUGH:**  We can look at the file.
13          **MS. MCFADDEN:**  Your Honor, I believe he was released
14  on conditions by Judge Peake in early October of 2017.
15          **THE COURT:**  Okay.  Good.  Thank you.  That will help
16  me find it.
17          **THE CLERK:**  I think it's No. 13 on the docket.
18          **THE COURT:**  13.
19          **MS. CLOUGH:**  Your Honor, in paragraph 8 of the
20  presentence report, it also mentions not the specific
21  conditions that -- the date of a modification on January 11th
22  as well.
23          **THE COURT:**  Okay.  I think that expanded his ability
24  to assist his mother.
25          **MS. CLOUGH:**  Right.  So they removed the location

1 monitoring service and allowed him to -- authorized welfare

2 checks as needed on his mother.

3        **THE COURT:** Okay. All right. I'm going to allow him

4 to self-report on October 3rd to either the marshal's office

5 here or -- at 10 a.m. or, if they've gotten him a designation,

6 he can report directly to the facility. I will require him to

7 comply with the same terms and conditions of pretrial release

8 as imposed by Judge Peake and later modified.

9    I am going to require him, in addition to those, to check

10 in with the probation office by telephone and to actually speak

11 to a probation officer at least twice a week. You know, it

12 is -- he's indicated some depression. One would think that

13 might be more -- worse now. You know, in some ways he knows

14 what's going to happen and I just would like there to be some

15 contact at least twice a week. Should the probation officer

16 think that some immediate mental health treatment is necessary,

17 then he shall comply with that direction.

18        **MS. CLOUGH:** As far as Judge Peake, she did allow him

19 to have the dogs that he had presently --

20        **THE COURT:** I'm not going to make him get rid of the

21 dogs overnight. He's had the dogs, nothing, you know --

22        **THE DEFENDANT:** Thirteen years.

23        **THE COURT:** -- nothing -- I'm not going to make him

24 change that overnight. That's -- when he gets out on

25 supervised release will be soon enough to deal with that.

1      **MS. CLOUGH:**  Thank you, Your Honor.

2      **THE COURT:**  He does have limited appeal rights.  If he

3 thinks there is a reason to appeal, he has to do that in

4 writing within 14 days of the entry of the Court's judgment.

5      What have I forgotten?

6      **MS. CLOUGH:**  Your Honor, I do make a motion to dismiss

7 the remaining counts of the indictment pursuant to the plea

8 agreement.

9      **THE COURT:**  Thank you.  Those are dismissed.

10     So, Mr. Lloyd, you need to either call in to the probation

11 office or set something up with them, but you need to actually

12 speak to your supervising pretrial officer or their designee at

13 least twice a week.  So, you know, it's on you to make sure

14 that that happens.  You don't need to go in necessarily, but I

15 want you to be sure you're talking to them and they're, you

16 know, checking on your welfare and confirming your compliance

17 with everything.

18     Have I forgotten anything else or is there anything else

19 anyone wants to ask me to do?

20     **MS. CLOUGH:**  Not that I'm aware of, Your Honor.

21     **MS. MCFADDEN:**  Your Honor, this may be reflected in

22 the judgment, but in terms of the fine, that would be just for

23 one of the three counts; is that correct?

24     **THE COURT:**  Yes.  Thank you so much.  Just one fine on

25 Count One and I will waive the fine on the other counts

1  because -- I mean, he does have I think a limited ability to

2  pay and that amount seems to be -- to me to be sufficient.

3      Anything else?  No?

4          **MS. MCFADDEN:**  Nothing further for the Government.

5          **MS. CLOUGH:**  No, Your Honor.

6          **THE COURT:**  All right.  Good luck, Mr. Lloyd.

7      We're adjourned.

8      (Proceedings concluded at 3:19 p.m.)

9

10

11              **C E R T I F I C A T E**

12      I, LORI RUSSELL, RMR, CRR, United States District Court
   Reporter for the Middle District of North Carolina, DO HEREBY
13  CERTIFY:

14      That the foregoing is a true and correct transcript of the
   proceedings had in the within-entitled action; that I reported
15  the same in stenotype to the best of my ability and thereafter
   reduced same to typewriting through the use of Computer-Aided
16  Transcription.

17

18  *Lori Russell*

19  Lori Russell, RMR, CRR        Date: 3/4/2020
   Official Court Reporter
20

21

22

23

24

25