IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 1:17CR270-1 |
| | : | |
| BREXTON REDELL LLOYD | : | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR EARLY TERMINATION OF SUPERVISION

NOW COMES the United States of America, by and through Matthew G.T. Martin, United States Attorney for the Middle District of North Carolina, and responds in opposition to Brexton Redell Lloyd's motion for early termination of supervised release, stating as follows:

I. PROCEDURAL HISTORY

Lloyd was convicted in this district of one count of conspiracy to possess dogs with the purpose of having them engage in an animal fighting venture, in violation of Title 18, United States Code, Section 371, and two counts of possession of dogs with the purpose of having them engage in an animal fighting venture. Docket Entry [Dkt.] 38. The Court sentenced Lloyd to twelve months and one day in prison and a three year term of supervised release, as to each count, to run concurrently. *See* Dkt. dated Aug. 2, 2018; *see also* Dkt.

38. On August 5, 2020, just over a year into his three-year term of supervision,[1] Lloyd moved for early termination of supervised release, citing his compliance with the terms thereof, as well as completed rehabilitation.[2] *See* Dkt. 44. By memorandum filed on August 17, 2020, the United States Probation Office indicated that it does not object to this request. Dkt. 45.

II.   DISCUSSION

Pursuant to 18 U.S.C. § 3583(e)(1), the Court, "after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4) and (a)(7)" may terminate "a term of supervised release" "after the expiration of one year of supervised release . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e). Thus, a court may consider not only what a defendant has or has not done over the course of his prison sentence and first year of supervision, but other issues outside of the conduct of the defendant that might impact how the justice system is perceived. *See United States v. Pregent*, 190 F.3d 279, 282 (4th Cir. 1999) (affirming denial of motion for early termination of supervised

---

[1] Lloyd was released from the Bureau of Prisons on August 1, 2019. *See* "Bureau of Prisons: Inmate Locator," BOP.gov, available at: https://www.bop.gov/inmateloc/ (last visited Aug. 18, 2020).

[2] Lloyd also argues that this Court was not authorized to impose a term of supervision exceeding one year. He is wrong. The three felonies of which he was convicted each carry a maximum punishment of five years and, as such, are Class D felonies. 18 U.S.C. § 3559(a)(4). The maximum term of supervised release for Class C and D felonies is three years. 18 U.S.C. § 3583(b)(2).

release for abuse of discretion and approving of district court's consideration of matters beyond the defendant's actions). Further, as the Court noted in *Folks v. United States*, "[o]ne of the purposes of supervised release is to provide rehabilitation and oversight of the offender to deter their return to crime." 733 F. Supp. 2d 649 (M.D.N.C. 2010). To that end, "[m]odel prison conduct and full compliance with the terms of supervised release is what is expected of a person under the magnifying glass of supervised release and does not warrant early termination," and that if full compliance was a sufficient reason to terminate supervised release, "the exception would swallow the rule." *Id.* at 652 (citing cases).

Here, the nature and circumstances of the crime, the need to promote respect for the law, and the need to avoid unwarranted sentencing disparities counsel against granting Lloyd's motion.

Regarding the crimes of conviction, Lloyd participated in an animal fighting conspiracy for a number of years. Dkt. 31. Authorities intercepted multiple telephone conversations Lloyd had with co-conspirators about how to prepare a dog for a fight and how to determine if the opponent was attempting to poison your dog. *Id.* In a text message, Lloyd "called out a fight," that is, attempted to find a dog of a specific weight for a fight with another opponent's dog. *Id.* In March 2017, federal agents searched the property where Lloyd now resides again, and rescued thirteen pit bull dogs. *Id.* Two of the adults showed

3

scarring consistent with animal fighting. *Id*. Authorities also seized fight training implements, videos of a dog fight and dogs being trained to fight, and still images of one of Lloyd's pit bull dogs training, that is, dragging a large tire – attached by a chain to her harness – on a road in front of Lloyd's residence. *Id*. The grand jury then returned a thirteen-count Superseding Indictment charging conspiracy and substantive animal fighting counts related to each rescued dog. Dkt. 4.

After Lloyd was arrested on federal charges but prior to his detention hearing, the Probation Officer interviewed his girlfriend, Jennifer Lamper, about the number and breed of dogs on the property where Lloyd intended to return on pre-trial release. Dkt. 10, 31. This information was critical to Magistrate Judge Peake's assessment of suitable release conditions. Lamper stated there were five non-pit bull dogs on the property. Unbeknownst to that interviewing officer, but revealed on recorded jail calls, at the time she made that statement, there were nine dogs on the property, including four pit bull-type dogs. Further, Lloyd and Lamper, in coded language, arranged for a "transporter"[3] to take four pit bull dogs from the property and did not disclose

---

[3] Dog fighters frequently employ and pay individuals to transport pit bull-type dogs to other dog fighters. They refer to these individuals as "transporters." Dog fighters may use a transporter when they are selling a dog, permanently or temporarily giving a dog away, sending a dog to the location of a dog fight, or sending a dog to be trained for a fight.

4

that information to the Probation Officer. *Id*. To date, the government has not recovered those animals. Despite this conduct, the government did not move for an obstruction enhancement related thereto, did not oppose Lloyd's motion to self-report to his designated BOP facility, and did not oppose Lloyd's request to amend the terms of his supervised release as it related to moving back in with and possessing certain animals.

The Court sentenced Lloyd to a custodial term (albeit in a downward variance from his advisory Guidelines range of 15-21 months) of a year and a day and three years of supervised release. In terms of Lloyd's history and characteristics, the Court had most of the information before it at sentencing that Lloyd now cites as grounds for early termination: that is, he had no criminal record, he served in the United States military, he was employed by the Bureau of Prisons for many years, and he has been diagnosed with Post-Traumatic Stress Disorder. *See generally* Dkt. 31. In his motion, Lloyd cites the burden of not living with Lamper because of restrictions on his access to dogs,[4] but he petitioned to change those terms, and the Court granted his petition. And he was not owed such a dispensation as matter of right, despite

---

[4] Lloyd characterized this term of his supervision thus: "for some time, I was prevented from living in my own home because of a special condition of supervised release involved having no ownership of any dogs. Because Jennifer owns dogs that live in my home, I was forced to live in a trailer down the road." Dkt. 44, at 11. In fact, Lamper owns the property where Lloyd now resides and no one "forced" Lloyd to live elsewhere, except Lamper, by choosing to keep the dogs in the residence.

5

his characterization of it: Lloyd went to prison for abusing animals. The right to possess them again is a privilege.

Now Lloyd wants to return to his old life, with his dogs, free of any court oversight. First and foremost, cutting Lloyd loose from supervision by the same office that he and Lamper sought to deceive at the outset does not promote respect for the law. Further, his crimes of conviction occurred on the very land where he again resides. He was engaged in the conduct at issue – animal cruelty – for years prior to his federal arrest. This weighs against early termination. As the Court noted in *United States v. Taylor*, in denying the defendants' motion for early termination after an eight-month custodial term, "[t]he offense committed by the [defendant]s was quite serious. While the offense conduct was an aberration of sorts in that the Defendants did not have prior felony convictions, it was not truly aberrant behavior. It did not consist of a single criminal act but instead consisted of numerous criminal acts that the Defendants committed over a period of almost six years." *See* No. 3:08CR047, 2011 WL 1167212, at *3 (E.D. Va. Mar. 24, 2011). Moreover, the home where Lloyd trained dogs for fights is on property that is rural and far recessed from publicly-traveled roadways. Thus, it is entirely possible for Lloyd to engage in the same conduct again without attracting attention. In fact, save law enforcement flyovers of the area, court supervision is the only safeguard
6

against recidivism here. Lloyd has been out of custody for just over a year. Per USPO, he is not a burden to their system.

Finally, dating back to 2016, fourteen individuals have been convicted and sentenced for dogfighting offenses as a part of the Environmental Crimes Section's "Operation Grand Champion." While each defendant is certainly unique, it is worth noting that thirteen of those fourteen defendants[5] received a three year term of supervised release; to date, none have received early termination of that supervision.

Factoring in Lloyd's lengthy involvement in animal fighting ventures, the fact that he and Lamper were not forthright with USPO when he was first arrested, the extreme privacy afforded by his current residence, and the fact that he has not even served half of his supervised release term, there is no reason under Section 3553(a) justifying its early termination.

---

[5] The fourteenth defendant received a downward departure to his sentence based on substantial assistance and a two year term of supervised release.

This the 31st day of August, 2020.

                                MATTHEW G.T. MARTIN
                                United States Attorney


                                /S/ JOANNA G. MCFADDEN
                                Assistant United States Attorney
                                NYSB No.: 4500948
                                United States Attorney's Office
                                101 S. Edgeworth St., 4th Floor
                                Greensboro, NC  27401
                                336/333-5351

                                /S/ ERICA H. PENCAK
                                Trial Attorney
                                NYSB No.: 4570263
                                U.S. Department of Justice
                                Environmental Crimes Section
                                150 M Street, NE
                                Washington, DC 20002
                                202/514-1543

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and mailed a copy to the defendant via United States Postal Service at the following address:

Brexton Redell Lloyd
156 Winford Road
Eagle Springs, NC 27242

                                        MATTHEW G.T. MARTIN
                                        United States Attorney


                                        /S/ JOANNA G. MCFADDEN
                                        Assistant United States Attorney
                                        NYSB No.: 4500948
                                        United States Attorney's Office
                                        101 S. Edgeworth St., 4th Floor
                                        Greensboro, NC   27401
                                        336/333-5351